IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| VERONICA WILLIAMS; MARGIE HOPSON; VICKIE LYNN COTTON; CONSTICA LOGWOOD; PAUL HUDSON, and PAUL ALEXANDER, | ) ) ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) CIVIL ACTION NO. 99-RRA-0717-S ) |
| WAFFLE HOUSE, INC., and TREETOP, INC., | ) ) ) |
| Defendants. | ) ) |

ENTERED
APR 17 2002

## MEMORANDUM OF OPINION

The plaintiffs contend that on September 16, 1998, they were refused service at a Waffle House in Hoover, Alabama, because of their race, which is black. They bring claims under 42 U.S.C. §1981, which prohibits discrimination in the making and enforcement of contracts; 42 U.S.C. §1982, which prohibits discrimination in the buying or selling of real and personal property; 42 U.S.C. §2000a, which prohibits discrimination in a place of public accommodation; and state law claims of outrageous conduct and negligent supervision. The plaintiffs seek compensatory and punitive damages in unspecified amounts.

Waffle House filed a motion for summary judgment, along with supporting brief and evidence, on the ground that Treetop's relationship with it is one of independent contractor only, with Waffle House having no control over the day-to-day operation of the Hoover restaurant. The plaintiffs responded that this motion was premature, as discovery was ongoing.

Later, the defendants filed a joint motion for summary judgment on the merits. The defendants seek dismissal of the federal claims, following which they request that the court exercise its discretion and decline pendant jurisdiction over the two state law claims.[1] The defendants submitted a legal memorandum and summary judgment evidence in support of this motion. The plaintiffs filed a brief in response, opposing both summary judgment motions, to which the defendants filed a reply. The court will consider only the summary judgment evidence actually referenced by the parties in their written argument. *See Street v. J.C. Bradford & Co.*, 886 F.2d 1472-80 (6th Cir. 1989).

---

[1] The defendants have not addressed the merits of the state law claims.

## JOINT MOTION FOR SUMMARY JUDGMENT ON THE MERITS

The defendants' joint motion for summary judgment on the merits will be addressed first.

### Facts

Although the facts are relatively few, some of the plaintiffs' statements, as the defendants point out, are contradictory with the statements of their co-plaintiffs, and at least one plaintiff contradicts himself. Of course, the evidence will be viewed in the light most favorable to the plaintiffs. From the parties' statements of the facts, the court elects to set out the following.

The six plaintiffs, as a group, went to the Hoover Waffle House. Plaintiff Paul Alexander was the first to enter the restaurant and he immediately walked to the restroom. He testified in his deposition to hearing a racial epithet as he went to and as he returned from the restroom:

> A. As they put me out at the door, I entered into the Waffle House. As I was walking toward the restroom, the man's restroom, I heard one of the ladies said here come them niggers, just like that. I didn't pay it no mind, I kept going, you know, because I had to go real bad.
> Q. Where were you when you heard that?
> A. I was going to the restroom, walking past them to the restroom.
> Q. How close to the restroom were you when you heard that?
> A. I'd say from me to where you are sitting at.
> Q. And who did you hear say that?
> A. One of the girls that was behind the counter.

> Q. Do you know which - -
> A. No.
> Q. Do you know the name of the person that said that?
> A. No, I really don't.
> Q. And what did she say exactly again?
> A. She said - - she said nigger. I heard she said nigger. I kept going to the restroom. When I came back out, I heard she said don't put them niggers on my side.

*Alexander Deposition*, pp. 21-23. It is undisputed that the person Alexander overheard was a waitress, Brenda Barnett.

The restaurant was full of customers when the plaintiffs entered. After they had waited approximately five minutes for a place to sit, another waitress, Shirley Hilliard, asked how many booths the plaintiffs needed. Plaintiff Veronica Williams replied that they needed two booths. When two booths became available, Williams and her three-year old son; plaintiff Vickie Lynn Cotton and her one-year old daughter; and plaintiff Margie Hopson sat in one booth, while plaintiffs Constica Logwood, Paul Hudson, and Alexander took a separate booth. As they were being seated, Williams and Hudson overheard a waitress say, "Don't put them on my side." Neither Williams nor Hudson heard the speaker utter a racial epithet. Again, it seems clear that the waitress who made this remark was Barnett.

*The Logwood/Hudson/Alexander booth*

Logwood, Hudson, and Alexander testified that Hilliard cleared their booth of dirty dishes, and that she took their orders, albeit after a wait of approximately twenty minutes. Logwood testified that this booth was in Hilliard's section, and also that he asked the plaintiffs at the other booth why they were going to leave:

> Q. Do you know which waitress' section that you were sitting in?
> A. I was sitting in the other one - - what is her name? I think it was Shirley. I don't know which one of them I was sitting, but the one I was sitting in, she asked, you know, did we want, you know, to take our order. So at that time, I asked Margie and them - - Margie and them said that - - she was like - - I had asked Margie and them was they going to stay or was they going to go. And Margie and them said they was fixing to get ready to go. And I was like for what? For what? They go to telling me. So, I said "Well, okay, y'all let's go." I said, "If one don't get served, why is she going to take our order? If one don't get served, it don't mean - - you know, we all need to get served." So we all just jumped up and we left.

*Logwood Deposition*, pp. 39-40. Clearly, these three plaintiffs were not denied service.


*The Williams/Hopson/Cotton booth*

Apparently after clearing and taking orders at the Logwood/Hudson/Alexander booth, Hilliard went over and apologized to the other plaintiffs, stating that she did not know what Barnett's problem was. It seems undisputed that this booth was in Barnett's section. Hilliard offered to bring water or juice for the two children while the plaintiffs were waiting for service.

Hopson testified that it was only when Hilliard apologized about the delay that the plaintiffs in this booth became aware that Barnett was in fact ignoring them:

> Q. Let me interrupt you there. Shirley Hilliard's comments to you, were they a response to a question that you asked her, or did she just come up and volunteer this?
> A. She's the one that made -- she's the one that made us aware that she really was ignoring us. I mean, it was in the back of our minds, but we didn't actually say anything until she came and apologized.

*Hopson's Deposition*, p. 29.

After Hilliard's apology, the plaintiffs in this booth waited approximately five more minutes for their table to be cleared and their orders taken, and then Hopson and Cotton decided it was time to speak to the restaurant manager, David Rogers. When asked why they were not being served, Rogers, who did not know that Burnett was perhaps deliberately ignoring these three plaintiffs, replied that Barnett had had a long day. He also stated that he would take "take care of [Barnett] or whatever." *Williams Deposition*, p. 34. The plaintiffs, however, decided to leave the restaurant immediately, which they did. They left in possession of a telephone number Rogers had given them to use, if they wanted to complain to Jay Ezell, Treetop's area manager. The plaintiffs did not tell Rogers that they thought they were not receiving service because of their race. Outside the restaurant, the plaintiffs called the police. Hilliard at that time brought

drinks out for the two children. When the police arrived, the plaintiffs were informed that their complaint, whatever it was, was a civil matter.

*Barnett and other customers*

There is testimony that Barnett waited on other customers after the plaintiffs were seated. There is also evidence that before the plaintiffs arrived at the restaurant, Barnett had waited on white customers while ignoring black customers. In what is referred to as her "company statement," dated September 18, 1998, Hilliard states:

> Waiting tables on two during 2nd shift dinner rush. 3 black men and one white man came in together and sat in Brenda's section. (in-a-both). Brenda told me that I would have to wait on them if they expected to be served. So I did. Store continued to be very busy. The next group that came in and sat down (they were white), and I said I'll get them. And she said not, I will, and she waited on th[em]. I thought that she meant for me to take over tables while she cleaned, as the store was a mess because of the rush. It was after this that a group of 7 or so black people came in. I attempted to clear the low ba[sic] and asked if they could sit there. There was one boo[th] open and they wanted to squeeze into it. Brenda then said loudly "Do not sit them in my section. I ain't gonna wait on them. Do not sit them in my section." I was embarrass[ed][sic] in front of the customers because of this.

*Plaintiff's Brief*, Exhibit A. (Hilliard does not state that Barnett used the word "nigger.") Additionally, while Hopson was complaining to the manager, Barnett was in the back of the restaurant. After the plaintiffs had left the service area, Barnett returned to the front and resumed waiting on her customers.

*Subsequent events*

The plaintiffs then went to another local Waffle House restaurant in Vestavia, where they gave their account of what happened at Hoover to a waitress, Mary Gerve. The plaintiffs rely on Gerve's hearsay "company statement," which is also dated September 18, 1998.[2] That statement, however, is somewhat confusing and full of hearsay, and, therefore, of little evidentiary value.[3] That night, the plaintiffs created a

---

[2] Neither Hilliard's statement nor Gerve's statement is sworn or declared under penalty of perjury.

[3] It states:
> On September 16, 1998, 7 black adults, with 2 small children came into the Vestavia Waffle House around 9:30 p.m. The customers were very upset about their treatment at Hoover Waffle House. Customers stated that a racial slur was made by a waitress Shirley that a waitress Brenda would not serve them because they were black. They (customers) were extremely upset, but were very composed and well mannered in expressing their complaint. They informed me that the police were called and was advised that this was a civil matter. I then asked the customers what was done for them by management at the Hoover store. They said they spoke to David Rogers however I did not confirm that. Nancy had called the Hoover store to inquire about the situation, and spoke to Donna. Donna informed Nancy and I that Shirley was the one who made the comment about the customer not being served because of being black. Donna again stated that Brenda was not aware of that comment. She said that Brenda was only requesting that she not sit her section until she cleared it. Donna then informed us that Jay Ezell's home number was to be given. Nancy and I were adamant about not doing that, however, they insisted that all those ph[sic] numbers were given to the customers. However, the customers insisted that they did not have numbers, so Nancy and I gave the numbers reluctantly (meaning the home number). I gave them Drew Rogers and Birmingham Office number. The customers were very thankful and were very kind to me. They tipped me $25.00 and thanked me for my help. Again I was not in the Hoover store and all as Nancy and I tried to do was keep a bad situation from getting

(continued...)

document which has no heading and is not signed by anyone, but is referred to by the parties as the plaintiffs' "group statement." It states, in part, that Rogers was polite and cooperative. It does not state that racial epithets were used. The following day Williams called and spoke to Jay Ezell, who told Williams he would investigate. The very next day, Ezell called Williams and informed her that Barnett had been dismissed.

## DISCUSSION

The court has considered the cases cited by the parties. If Williams, Hopson, and Cotton are to prevail on any of their federal claims, the summary judgment evidence must be sufficient to support a finding that they were *refused* service, and that the refusal was motivated by racial animus. If service was not refused, the plaintiffs' claims must fail.

The evidence is sufficient to allow a jury to find that Brenda Barnett refused to wait on the booth in which Williams, Hopson, and Cotton were sitting, along with the two small children. The evidence is also sufficient to support a finding that Barnett refused to wait on those people because of their race. Crucial to such finding of racial animus is

---

[3](...continued)
    worse. However, I must state that this was not the first complaint that I
    have received regarding this issue.

*Plaintiff's Brief*, Exhibit B.

the testimony of Paul Alexander, the only person who testified to hearing Barnett refer to the plaintiffs as "niggers." The defendants, however, argue that Alexander's testimony should not be considered. They point out that neither the complaint nor the plaintiffs' "group statement" mention such epithet.[4] Although such omissions, particularly in the "group statement," create a strong credibility issue, Alexander's testimony that he heard Burnett use the word "nigger" is proper evidence. The question, then, is whether, under all the circumstances, the actions or inactions of one waitress, Brenda Barnett, constitute a refusal by Defendant Treetop to serve these three plaintiffs.

The plaintiffs were not refused entry into the restaurant; indeed, they were asked how many booths they wanted. Waitress Hilliard apologized about Barnett's failure to wait on these three plaintiffs, and offered to get juice or water for the children while they waited. However, some waiting was required by everyone because the restaurant was very busy at the time. Even Hilliard, whose behavior toward the plaintiffs was, without question, polite and solicitous, was unable to clear the table in her section where Logwood, Hudson, and Alexander were seated until approximately twenty minutes after they had sat down. After the Hilliard apology, Williams, Hopson, and Cotton waited

---

[4] Alexander testified that he does not know why the epithet was not in the group statement.

approximately five more minutes more before Hopson and Cotton decided to talk to the manager about their booth not being waited on. Rogers, who was not told that there might be a discrimination problem, thought of a reason that Barnett had not waited on the plaintiffs: Burnett had had a hard day. But Rogers did not let it go at that. He said he was going to take care of the problem. These plaintiffs, however, did not give him a chance to do so. Williams, Hopson, and Cotton simply decided to leave, and Logwood, Hudson, and Alexander, who were unquestionably being served, decided to leave with them. No one asked the plaintiffs to leave. While the plaintiffs were waiting outside for the police to arrive, Hilliard took drinks out to the two children.

The court concludes that even if Barnett was not waiting on these three plaintiffs because of their color, Williams, Hopson, and Cotton were not being refused service, rather they were having to *wait* to be served. *See Robertson v. Burger King*, 848 F.Supp. 78 (E.D. La. 1994). In some circumstances, a long wait might be tantamount to being refused service, but that is not the event in this action. Williams, Hopson, and Cotton simply elected not to wait for the restaurant manager to get them served.[5] The facts in this case are quite different from the facts in *Laroche v. Denny's*, 62 F.Supp. 2d 1375 (C.D.

---

[5] If damages were an issue, Treetop's prompt investigation which apparently resulted in the discharge of Burnett would have to be considered in any calculation of damages.

Ill. 1992), a case cited by the plaintiffs. In *Laroche,* there was actual denial of service: the plaintiffs in that case were made to leave the restaurant and the doors were locked behind them.

## WAFFLE HOUSE'S MOTION FOR SUMMARY JUDGMENT

The plaintiffs contend that although Waffle House and Treetop are separate legal entities, and although Treetop might have certain limited control over the Hoover Waffle House," there exists a question of fact regarding the authority and public representation of Waffle House." *Plaintiffs' Brief*, p. 15. The plaintiffs rely on that part of the franchise agreement which requires Treetop to comply with all laws, state and federal; on the "Waffle House Hot Line," which requires that all acts of discrimination be reported; on Waffle House's retention of the right to revise the system and to terminate the franchise agreement for any violation of the agreement; and on Treetop's obligation to indemnify Waffle House for any and all liability resulting from Treetop's operation of any of Treetop's Waffle House restaurants. The plaintiffs assert that the defendants are "joint tortfeasors with joint knowledge of the discrimination." *Id.*

There is a legal difference between Waffle House's right or duty to take certain actions if Treetop violated the terms of the franchise agreement, and a right or duty to be involved in the daily supervision of franchise waitresses or other employees. Although the franchise agreement in question gave Waffle House "the right, at any time, to periodically inspect all of the facilities and procedures used in connection with the operation of the restaurant, including the right to enter all parts of the premises and to confer with Franchisee and its agents and employees with regard to all phases of the restaurant," Waffle House was not to be involved in the daily operations of its many franchises.[6] *Waffle House's Motion for Summary Judgment* (ct. doc. 15), Exhibit 1 to the Tyler affidavit, ¶ 28. Treetop alone was responsible for the day-to-day operations of its own restaurants. Waffle House might have had a duty to take some appropriate action if Waffle House had known of civil rights violations at the Hoover restaurant, but there is no evidence that Waffle House had or should have had such knowledge.[7]

---

[6] There are approximately 642 Waffle Houses franchises in the United States that are owned and operated by persons or entities other than Waffle House. Treetop operates approximately 104 such franchises.

[7] The franchise agreement expressly states that Treetop was an independent contractor. Such conclusion is not undermined by the rest of the terms in the franchise agreement.

After consideration of all of the evidence pointed out by the parties concerning the relationship between these separate legal entities, it is concluded that Waffle House cannot be held responsible for any violations of federal law that might have occurred on September 16, 1998. Neither would the evidence support a finding that Waffle House is liable on the plaintiffs' negligence claim or outrageous conduct claim.

## STATE LAW CLAIMS

The defendants urge the court to dismiss the state law claims because they are the only claims remaining. Without the plaintiffs' consent, the court is disinclined to do so. Further, the court will not address the question whether the state law claims should be dismissed on their merits until the defendants have submitted argument on that question, and until the plaintiffs, who have stated in their response brief why these claims should not be dismissed on their merits, have been given an opportunity to reply.

## CONCLUSION

Wherefore, Waffle House's motion for summary judgment (ct. doc. 15) is due to be granted because Waffle House cannot be held legally liable for any federal or state law

violations committed by Treetop employees at the place and time in question. Further, the defendants' joint motion for summary judgment on the merits of the plaintiffs' federal claims (ct. doc. 22) is due to be granted, but a ruling on the state law claims is held in abeyance pending further proceedings. An order in accordance with this memorandum of opinion will be entered.

DONE this _16th_ day of April, 2002.

_Robert R. Armstrong_
Robert R. Armstrong, Jr.
United States Magistrate Judge